**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

**MONIB ZIRVI et al.,**

                              **Plaintiffs,**            **18-cv-7003 (JGK)**

            **- against -**                              **OPINION AND ORDER**

**JAY T. FLATLEY et al.,**

                              **Defendants.**
_____

**JOHN G. KOELTL, District Judge:**

In the Second Amended Complaint (the "Complaint" or "SAC"), the plaintiffs allege that the defendants have orchestrated a wide-ranging conspiracy over the past twenty-five years to steal the plaintiffs' trade secrets consisting of proprietary discoveries related to the encoding and decoding of DNA. The plaintiffs are scientists Monib Zirvi, Matthew Lubin, Maria Kempe, and Norman Gerry. The defendants are scientists and businesspeople Jay Flatley, David Walt, Stephen Fodor, Kevin Gunderson, Jian-Bing Fan, Mark Chee, and John Stueplnagel, a patent lawyer Robin Silva, and biotechnology companies Affymetrix, P.E. Applied Biosystems, and Illumina, Inc. The plaintiffs allege claims under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, et seq.; the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, et seq.; the New York common law of trade secrets protections; and claims for other common law torts of fraud, conversion, tortious

1

interference with prospective business advantage, inequitable
conduct, civil conspiracy, and breach of confidence. The
defendants collectively move to dismiss the Complaint under
Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil
Procedure on the grounds that the plaintiffs lack standing, that
the plaintiffs' claims are barred by various statutes of
limitations, and that in any event the facts alleged do not
amount to violations of federal or state law. In addition to
joining the defendants' motion, Stephen Fodor also moves
individually to dismiss the claims against him.

    For the reasons set out below, the motions to dismiss the
Complaint are **granted** and the Complaint is **dismissed with
prejudice**.

**I.**

    The defendants move to dismiss the Complaint pursuant to
Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack
of subject matter jurisdiction because the plaintiffs allegedly
lack standing to pursue their claims. "Dismissal of a case for
lack of subject matter jurisdiction under Rule 12(b)(1) is
proper 'when the district court lacks the statutory or
constitutional power to adjudicate it.'" Ford v. D.C. 37 Union
Local 1549, 579 F.3d 187, 188 (2d Cir. 2009) (quoting Makarova
v. United States, 201 F.3d 110, 113 (2d Cir. 2000)). In
considering a Rule 12(b)(1) motion, courts must construe all

2

ambiguities and inferences in a plaintiff's favor. However, a court may refer to evidence outside of the pleadings, and the burden is on the plaintiff to prove by a preponderance of the evidence that jurisdiction exists. See Makarova, 201 F.3d at 113. "To survive the motion to dismiss, the pleadings must only allege facts that affirmatively and plausibly suggest that Plaintiffs have standing to sue." Lowell v. Lyft, Inc., 352 F. Supp. 3d 248, 255 (S.D.N.Y. 2018) (quotations and alterations omitted). "[A]t the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." Baur v. Veneman, 352 F.3d 625, 631 (2d Cir. 2003).

The defendants also move to dismiss the Complaint pursuant to Rule 12(b)(6). In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v.

Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id. at 678. When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## II.

The following facts alleged in the Complaint are accepted as true for the purposes of ruling on the motions to dismiss.

The plaintiffs' claims, under both federal and New York State law, arise out of two alleged instances of misappropriation of trade secrets, one occurring in 1994 when certain trade secrets were allegedly stolen from a confidential grant proposal, and one occurring in 1999 when alleged trade

4

secrets were allegedly misappropriated during confidential
communications. The plaintiffs allege that these two acts of
misappropriation resulted in the theft of both positive and
negative trade secrets.[1] In order to overcome the various
statutes of limitations, the plaintiffs also allege the
existence of an overarching, twenty-five-year conspiracy of
fraudulent concealment engineered by the defendants that
allegedly prevented the plaintiffs from learning the full extent
of the defendants' misconduct until 2015. Because they allegedly
only discovered the conspiracy in 2015, the plaintiffs allege
that this action, which the plaintiffs filed on August 3, 2018,
is timely because the statutes of limitations should be
equitably tolled until the discovery of the alleged conspiracy.
SAC ¶¶ 5-6, 9-13, 26-31.

    Throughout the early 1990s, the plaintiffs began
collaborating in various capacities with Dr. Francis Barany of
Cornell University Medical College (now Weill Cornell Medical
College) to "creat[e] an entirely novel method for diagnosing
human genetic defects." SAC ¶¶ 2, 16, 20 (Lubin), 34 (Zirvi), 37

---

[1] The Complaint describes negative trade secrets as "the trade secrets
reflecting, referencing and relating to the thorough scientific process
required to create a trade secret, much of which was unsuccessful and
resulted in experimental dead ends (i.e. negative) but which was crucial in
the ultimate invention and success of the trade secret." SAC ¶ 12 n.1.

(Gerry), 102 (Lubin and Gerry), 196 (Kempe).[2] In February 1994, Barany's team, which included Lubin, submitted a grant proposal to the National Cancer Institute containing alleged trade secrets. Id. at ¶¶ 102-03. The achievement of the Barany proposal, allegedly, was "a radical new idea of 'Universal Addressable Arrays.'" Id. at ¶ 104. The array was a grid structure made up of numerous squares in which each square contained a "man-made designed DNA sequence[]" that the Barany team referred to as a "zip code" and each square was referred to as an "address[]." Id. at ¶ 109(I). The arrays worked together with a ligase detection reaction ("LDR") in which DNA would be extracted from a biological sample and matched up to the array to reveal genetic mutations through a process known as polymerase chain reaction ("PCR"). Id. at ¶¶ 72, 104, 107(3), 109(I), 109(III). The technologies developed by the plaintiffs throughout the 1990s and early 2000s, and which formed the basis for numerous patent applications, were all broadly related to LDR, PCR, zip code array, and DNA sequencing. Id. at ¶¶ 135 ('917 and '470 patent series), 162 ('594 patent series), 208 ('917, 470, and '594 patent series), 259 ('293, '470, and '917 patent series), 310 ('470 and '293 patent series).[3]

---

[2] Neither Barany nor Cornell University nor any of Cornell's affiliated entities are plaintiffs in this case.

[3] Patent series are referred to throughout the Complaint by the last three digits of the United States Patent Number. Thus, the '470 patents series corresponds to Patent No. 6,797,470 issued on September 28, 2004 and based on

The first alleged instance of misappropriation occurred on or around June 1, 1994 when Stephen Fodor, the Chief Technology Officer of the biotechnology company Affymetrix, in his capacity as a peer reviewer for the National Institute of Health ("NIH"), reviewed the Barany proposal. Id. at ¶ 16. According to the plaintiffs, upon reviewing the grant proposal, Fodor "immediately resolved to steal those ideas" contained in the grant proposal in violation of confidentiality agreements that he was bound to obey in his capacity as an NIH reviewer. Id. at ¶¶ 20, 114-17. Fodor then allegedly enlisted Affymetrix employees, the defendants Mark Chee, Jian-Bing Fan, and Kevin Gunderson, to begin filing patent applications based on the technologies and ideas described in the grant proposal. Id. at ¶ 123.

According to the plaintiffs, Fodor "deliberately removed himself as a co-inventor of the October 26th, 1994 patent application" and instructed Chee, Fan, and Gunderson to file the patent applications in order to cover his tracks. Id. at ¶ 125.

---

a series of applications going back to May 29, 1996 and invented by, among others, Barany and Lubin. Prakash Decl., Ex. 3. The '917 patent series corresponds to Patent No. 7,083,917, issued on August 1, 2006 and based on applications going back to February 4, 1997, and invented by, among others, Barany, Kempe, and Zirvi. Prakash Decl., Ex. 6. The '293 patent series corresponds to Patent No. 6,534,293, issued on March 18, 2003 and based on an application filed on January 6, 1999, and invented by, among others, Barany, Zirvi, and Gerry. Prakash Decl., Ex. 12. The '594 patent series corresponds to Patent No. 6,506,594, issued on January 14, 2003 based on applications going back to March 19, 1999, and invented by, among others, Barany and Gerry. Prakash Decl., Ex. 16.

The October 26, 1994 patent application was one in a series of related patent applications that eventually resulted in the final application filed on April 3, 1996 and published as United States Patent No. 6,156,501 on December 5, 2000. Prakash Decl., Ex. 23, at 1:[63]; SAC ¶ 124. Notwithstanding the allegations in the Complaint that Fodor deliberately removed himself from these patent applications, his name appeared on an International Patent Application that was published to the world on May 4, 1995 under International Publication Number WO 95/11995. Gorman Decl., Ex. 3. The International Patent, which listed Fodor as an inventor, had an international application number of PCT/US94/12305, a number that corresponded to the October 26, 1994 application that was in the chain of applications that eventually culminated in the '501 patent series. Gorman Decl., Ex. 3, at 1:(21); Prakash Decl., Ex. 23, at 1:[63]. The International Patent was also related by continuation to a United States patent application numbered 08/284,064 that corresponded to an application in the chain of applications culminating in the '501 patent series. Gorman Decl., Ex. 3, at 1:(60); Prakash Decl., Ex. 23, at 1:[63].

On May 1, 1995, Barany allegedly explained "on a strictly confidential basis" to the defendant, Dr. David R. Walt of Tufts University, Barany's proprietary discoveries of "Zip Code chemistry," primers, and probes that could be used to encode and

decode DNA. SAC ¶¶ 132-33. Walt formed the defendant company Illumina Inc. in 1998, with defendants Chee, Fan, Gunderson, and John Stueplnagel as founding employees, and Jay Flatley as the first CEO. Id. at ¶¶ 140-42. Beginning in June 1998, Stueplnagel, Chee, and Gunderson filed several patent applications that were allegedly derived from the Barany grant proposal. Id. at ¶¶ 143-45, 149. More generally, the plaintiffs allege that the defendants filed patent applications that were designed to conceal the alleged source of the work by omitting certain information from the patent applications that could lead back to Barany and his team. Id. at ¶¶ 143-44, 149-50, 153.

Around this time, the plaintiffs Lubin, Zirvi, Kempe, and Gerry began to assign their rights in the '470, '917, '293, and '594 patent series to Cornell and the University of Minnesota, which later assigned its interests to Cornell. Id. at ¶¶ 3, 135, 168, 273, 321; Prakash Decl., Exs. 4, 7, 8, 9, 13, 22.

The second alleged instance of misappropriation occurred in 1999 after Zirvi, then a medical student at Cornell working with Barany, developed 187 files of Microsoft Excel and Word documents containing, among other things, the design of 4,633 zip codes including an alleged proprietary set of 465 zip codes. SAC ¶ 155. On August 8, 1999, Barany allegedly provided the 187

files to Bill Efcavitch of P.E. Biosystems.[4] Barany allegedly
instructed Efcavitch to keep the files secret pursuant to a
confidentiality agreement between Cornell and P.E. Biosystems.
Id. at ¶¶ 181-83. According to the plaintiffs, P.E. Biosystems
and Illumina were, unbeknownst to the plaintiffs, working
together at the time. Id. at ¶ 188.

On April 14, 2000, Barany, Zirvi, and Gerry, among others,
filed a provisional patent application, a "Method of Designing
Addressable Array for Detection of Nucleic Acid Sequence
Differences Using Ligase Detection Reaction," which would
eventually be published as United States Patent Number 7,455,965
("'965 patent") on November 25, 2008. Prakash Decl., Ex. 21; SAC
¶ 284. The '965 patent application was published to the world on
October 25, 2001. Prakash Decl., Ex. 19-1. According to the
Complaint, the '965 patent application "described PCR-LDR, 4,633
zip codes, Universal Arrays, detection of low abundance K-ras
mutations and included substantial data." SAC ¶ 284.

According to the plaintiffs, the data contained in the 187
files, and particularly in the 465-zip code set, were never
published and were not reproduced by the plaintiffs in the '965
patent filings even though those filings contained zip code

---

[4] Efcavitch is not a defendant in this case. P.E. Biosystems, which is a
defendant in this case is now a division of Thermo Fisher Scientific. SAC
¶ 49.

sets. Id. at ¶¶ 155-56. The plaintiffs allege that the precise order of the 465-zip code set was integral to its value and that the set, when misappropriated and used by the Illumina defendants, "became a clear and unmistakable marker for the theft of Dr. Zirvi's trade secret, much like a finger print or red ink exploding in a stack of bills stolen during a bank robbery." Id. at ¶ 156. Allegedly, the Illumina defendants Chee and Gunderson used the propriety zip code set in a patent application on August 25, 2000, entitled "Probes and Decoder Oligonucleotides." Id. at ¶ 320. The plaintiffs allege that Chee and Gunderson "blatantly copied the Barany team Zip Code IP" but renamed them "Illumacdoes." Id. at ¶¶ 320-21.

Then, in 2006, junior parties Barany, Kempe and Zirvi, among others, brought a patent interference claim before the United States Patent and Trademark Office alleging that Fodor and his Affymetrix colleagues had unlawfully derived the October 26, 1994 patent application and a related family of patents from the Barany grant proposal. Id. at ¶¶ 127, 180; Prakash Decl., Ex. 25. The Board of Patent Appeals ultimately concluded that "Barany's motion fails to establish, prima facie, that the [Affymetrix inventors] derived the subject matter of the count from Barany." Gorman Decl., Ex. 10, at 9.

On May 24, 2010, Cornell initiated a patent infringement case against Illumina in the United States District Court for

the District of Delaware. Cornell Univ. v. Illumina, Inc., No.
10-cv-433, 2017 WL 89165, at *1 (D. Del. Jan. 10, 2017); see SAC
¶ 1. In that case, Cornell alleged that Illumina infringed a
number of patents falling into two categories: (1) array patents
that related to tools that utilize oligonucleotides with
particular sequence properties to detect target molecules, and
(2) LDR-PCR patents that describe the combination of a ligase
detection reaction with polymerase chain reaction to test for
genetic changes. See Cornell, 2017 WL 89165, at *1. That
litigation ended on April 18, 2017 after the parties entered
into a joint stipulation to dismiss the case. Cornell Univ. v.
Illumina, Inc., No. 10-cv-433, Dkt. No. 598 (D. Del. Apr. 24,
2017).

      The plaintiffs allege that they learned about the conduct
underlying the Complaint in this case for the first time during
the Cornell v. Illumina, Inc. litigation in 2015, only after
Zirvi was deposed by Illumina lawyers. SAC ¶¶ 502-04. According
to the plaintiffs, the deposition of Zirvi was the initial
thread that, once pulled, revealed a complex, multi-decade
concerted effort to conceal the defendants' theft, as manifested
in the years of patent filings containing alleged purloined
trade secrets. Id. at ¶¶ 515-35. The plaintiffs allege that they
could not have discovered the defendants' actions sooner because
the defendants had taken great pains to cover their tracks by

                                12

filing patents under various names and using different
variations and combinations of technical terms in order to
disguise the scheme of theft and fraud. Id. at ¶¶ 339, 344, 347,
353, 363, 366, 371-483.

On August 8, 2018, the plaintiffs initiated this action,
alleging violations by all or some of the defendants of the
DTSA, civil RICO, New York common law trade secrets protections
and other common law torts. Dkt. No. 13. On December 6, 2018,
the plaintiffs filed an amended complaint, which amplified the
claims in the original complaint by adding more facts, and which
also added a claim for inequitable conduct against Robin Silva,
a lawyer for Illumina. Dkt. No. 102. On February 8, 2019, the
plaintiffs filed a second amended complaint, which contained the
same claims and basic set of facts as the first amended
complaint. Dkt. No. 127. The defendants now move to dismiss the
Complaint.

### III.

The gravamen of the Complaint is that the defendants
misappropriated the plaintiffs' trade secrets in violation of
both federal and New York state law in 1994 and 1999. The
plaintiffs argue that two separate acts of alleged
misappropriation – (1) Fodor's misappropriation of the Barany
proposal in 1994, and (2) the Illumina defendants'
misappropriation of Barany's and Zirvi's proprietary 465 zip

13

codes in 1999 – resulted in the defendants' wrongful ownership
of trade secrets that broadly fall into three categories – (1)
positive trade secrets contained in the 1994 Barany proposal,
(2) positive trade secrets contained in the 1999 proprietary zip
codes, and (3) negative trade secrets derived from both acts of
misappropriation that include the experimental knowhow and dead
ends that allegedly have independent economic value to a
competitor seeking to replicate the plaintiffs' experimental
results.

Although the defendants dispute that the factual
allegations in the Complaint state a claim for misappropriation
under either New York or federal law, their primary argument in
favor of dismissal is that any viable claim is barred by the
applicable statute of limitations. Because the defendants are
correct that the Complaint should be dismissed on statute of
limitations grounds, that issue will be discussed first.[5]

---

[5] The defendants also move to dismiss the Complaint for lack of standing. The
defendants argue that the plaintiffs either assigned their rights to others,
namely Cornell, or developed their intellectual property on behalf of others,
also Cornell, and therefore lack a sufficient interest in the intellectual
property to bring their claims. Usually, a Rule 12(b)(1) motion is addressed
before a Rule 12(b)(6) motion because the former affects the Court's subject
matter jurisdiction. See Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896
F.2d 674, 678 (2d Cir. 1990). However, what the defendants describe as a
question of standing is, in fact, a question about whether the plaintiffs can
state a claim under the law, a question formerly known as statutory standing.
See Lexmark Int'l., Inc. v. Static Control Components, Inc., 572 U.S. 118,
128 n.4 (2014); Am. Psychiatric Ass'n v. Anthem Health Plans, Inc., 821 F.3d
352, 359 (2d Cir. 2016) ("The Supreme Court has recently clarified, however,
that what has been called 'statutory standing' in fact is not a standing
issue, but simply a question of whether the particular plaintiff 'has a cause
of action under the statute.'") (quoting Lexmark, 572 U.S. at 127). The
question whether the plaintiffs "owned" or "possessed" the alleged trade

**A.**

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." Ellul v. Congregation of Christian Bros., 774 F.3d 791, 798 n.12 (2d Cir. 2014). In this case, the plaintiffs affirmatively pleaded the defendants' fraudulent concealment in order to overcome the statutes of limitations. Therefore, it is appropriate for the Court to decide the statute of limitations defense on this Rule 12(b)(6) motion.

**i.**

The federal claims in this case are subject to three- or four-year statutes of limitations. DTSA claims are subject to a three-year statute of limitations. See 18 U.S.C. § 1836(d). The limitations period runs from "the date on which the misappropriation with respect to which the action would relate

---

secrets is not a question of constitutional standing, but a question whether the plaintiffs can state a claim under either the DTSA or New York state law. See 18 U.S.C. § 1839(4) ("An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."); Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 117 (2d Cir. 1999) ("To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."). The Court could not resolve these issues on a motion to dismiss because there are factual disputes about the circumstances under which the intellectual property was developed.

is discovered or by the exercise of reasonable diligence should have been discovered," or, in other words, when the plaintiff "knew or should have known that the alleged trade secrets were wrongfully acquired, disclosed, or used." Uni-Systems, LLC v. United States Tennis Ass'n, Inc., 350 F. Supp. 3d 143, 178 (E.D.N.Y. 2018). RICO claims are subject to a four-year statute of limitations and accrual dates under the RICO statute are similarly determined when the plaintiff knew or should have known of the alleged injury. See Koch v. Christie's Int'l PLC, 699 F.3d 141, 148, 150-51 (2d Cir. 2012) ("As a general matter, the limitations period does not begin to run until a plaintiff has actual or inquiry notice of the injury.") (quotation marks, citation, and alterations omitted).

In this case, the date on which the alleged misappropriation "by the exercise of reasonable diligence should have been discovered" has long since passed. There are multiple events that the plaintiffs themselves described in the Complaint that triggered the statute of limitations. First, contrary to the plaintiffs' suggestion otherwise, Fodor's name appeared in the chain of patent applications that the plaintiffs allege contained trade secrets taken from the Barany grant proposal that culminated in the '501 patent series because it appeared on the face of the International Patent that explicitly cross-referenced the United States '501 Patent and the October 26,

16

1994 patent application. The existence of a patent application
or a public patent puts parties on notice of their existence and
therefore starts the clock on the limitations period. See
Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.,
182 F. App'x 994, 999 (Fed. Cir. 2006) (per curiam) (patent
applications put parties on constructive notice); WesternGeco v.
Ion Geophysical Corp., No. 09-cv-1827, 2009 WL 3497123, at *5
(S.D. Tx. Oct. 28, 2009) ("In the same way that the issuance of
a patent by the PTO constitutes notice to the entire world of
its existence, regardless of whether other persons take it upon
themselves to examine the records, so too, by extension, do the
applications published under the [Patent Cooperation Treaty]
constitute notice to the world of their existence . . . .").

Second, the Complaint itself refers to the 465-zip code set
allegedly misappropriated in 1999 as a "clear and unmistakable
marker for the theft of Dr. Zirvi's trade secret, much like a
finger print or red ink exploding in a stack of bills stolen
during a bank robbery." SAC ¶ 156. Based on the allegations in
the Complaint, the events in 1999 concerning the alleged
misappropriation 187 files and the 465-zip code set also
commenced the statute of limitations because any definition of
"reasonable diligence" would encompass the duty to discover
alleged wrongdoing at the time in which a self-described "clear
and unmistakable marker" of theft allegedly appeared in public

17

patent applications. Indeed, the plaintiffs' own allegations indicate that the 465 zip codes appeared in an August 25, 2000 patent application, although in a different order. SAC ¶¶ 155, 275. Thus, with respect to the alleged misappropriation in 1999, the plaintiffs are "chargeable with knowledge which by ordinary diligence [they] would have acquired." Barrio Bros., LLC v. Revolucion, LLC, No 18-cv-2052, 2019 WL 5213039, at *3 (N.D. Ohio Oct. 16, 2019) (quotation marks and citation omitted).

Finally, the statutes of limitations began to run no later than the dates of the patent interference proceedings before the USPTO and the litigation in the federal district court in Delaware. In 2006, two plaintiffs in this action, Zirvi and Kempe, were named as junior parties in the interference before the USPTO. Gorman Decl., Ex. 25. In 2010, Cornell University, the assignee of many of the patents relevant in this case, sued Illumina, Inc. regarding many of the same patents, which, at the very least, put the plaintiffs in this case on inquiry, if not actual, notice. See Maatuk v. Emerson Elec., No. 16-cv-3023, 2017 WL 9485679, at *8-9 (N.D. Ohio Nov. 14, 2017) (proceedings before the USPTO triggered a duty to inquire into alleged acts of misappropriation), report and recommendation adopted, 2018 WL 562934 (N.D. Ohio Jan. 24, 2018), aff'd, 781 F. App'x 1002 (Fed. Cir. 2019); 421-A Tenants Ass'n, Inc. v. 125 Court Street LLC, 760 F. App'x 44, 48-49 (2d Cir. 2019) (the commencement of

18

substantially similar claims in state court put the plaintiffs
on inquiry notice).

Therefore, whether the accrual date was in 1994, 1999,
2006, or 2010, the federal statutes of limitations have long
since passed. The federal claims are therefore barred by the
relevant statutes of limitations.

### ii.

Apart from the state law fraud claim and the claims for
injunctive relief, which are subject to six-year statutes of
limitations, N.Y. C.P.L.R. § 213(1), (8), the plaintiffs' state
law claims for damages are subject to three-year statutes of
limitations because they are all actions to recover damages for
an injury to property. See N.Y. C.P.L.R. § 214(4); Andrew
Greenberg, Inc. v. Svane, Inc., 830 N.Y.S.2d 358, 362 (App. Div.
2007) (state law misappropriation); Carlingford Ctr. Point
Assocs. v. MR Realty Assocs., L.P., 772 N.Y.S.2d 273, 274 (App.
Div. 2004) (breach of fiduciary duty); Harley v. Druzba, 565
N.Y.S.2d 278, 279-80 (App. Div. 1991) (breach of confidence);
Ingrami v. Rovner, 847 N.Y.S.2d 132, 134 (App. Div. 2007)
(unjust enrichment); Sporn v. MCA Records, Inc., 451 N.Y.S.2d
750, 751 (App. Div. 1982), aff'd 448 N.E.2d 1324 (N.Y. 1983)
(unfair competition); Collymore v. Sec'y of Hous. & Urban Dev.,
803 N.Y.S.2d 123, 124 (App. Div. 2005) (conversion); CDx Labs.,

Inc. v. Zila, Inc., 79 N.Y.S.3d 285, 287 (App. Div. 2018)

(tortious interference with business relations).[6]

New York law governing the accrual of statutes of limitations is less permissive for plaintiffs than the law under the DTSA or RICO. Statutes of limitations accrue for misappropriation claims when the defendant first discloses the trade secret or when the defendant first makes use of the plaintiff's ideas. See GeoVector Corp. v. Samsung Elecs. Co. Ltd., 234 F. Supp. 3d 1009, 1014 (N.D. Cal. 2017) (applying New York law). Many of the plaintiffs' other state law claims similarly accrue upon the alleged breach or tortious act. See, e.g., Ciccone v. Hersh, 530 F. Supp. 2d 574, 579 (S.D.N.Y. 2008) (breach of fiduciary duty), aff'd, 320 F. App'x 48 (2d Cir. 2009); Sporn, 58 N.Y.2d at 488 (conversion); Thome v. Alexander & Louisa Calder Found., 890 N.Y.S.2d 16, 30 (App. Div. 2009) (tortious interference with prospective business advantage).[7]

---

[6] "[C]onspiracy is not an independent tort, and is time-barred when the substantive tort underlying it is time-barred." Schlotthauer v. Sanders, 545 N.Y.S.2d 197, 199 (App. Div. 1989). Therefore, to the extent that the civil conspiracy claims rest on any or all of the underlying state law torts subject to three-year statutes of limitations, the claims for civil conspiracy are also subject to three-year statutes of limitations.

[7] Because a conspiracy tort "is time-barred when the substantive tort underlying it is time-barred," Schlotthauer, 545 N.Y.S.2d at 199, the conspiracy claims accrue at the same time that the underlying tort accrues. See also Rutkin v. Reinfeld, 229 F.2d 248, 252 (2d Cir. 1956) ("The person harmed by the conspiracy may bring suit as soon as the damage to him is inflicted . . . and the statute therefore begins to run at the moment such injury occurs.").

In this case, the plaintiffs' state law claims arise out of
the same factual allegations as their DTSA and RICO claims.
Thus, for substantially the same reasons that the statutes of
limitations have run on the DTSA and RICO claims, the statutes
of limitations have run on the state law claims, whether
governed by the three-year or six-year limitations period. The
alleged misconduct in this case occurred in 1994 and 1999, at
which point the claims accrued, and therefore the state law
claims are barred by the statutes of limitations. See
Synergetics USA, Inc. v. Alcon Labs., No. 08-cv-3669, 2009 WL
2016872, at *2 (S.D.N.Y. July 9, 2009) ("Misappropriation first
accrues either when defendant discloses the trade secret or when
he first makes use of plaintiff's ideas.") (internal quotation
marks and citation omitted).

### iii.

The plaintiffs nevertheless argue that the statutes of
limitations should be equitably tolled under the doctrine of
fraudulent concealment. "Under federal common law, a statute of
limitations may be tolled due to the defendant's fraudulent
concealment if the plaintiff establishes that: (1) the defendant
wrongfully concealed material facts relating to defendant's
wrongdoing; (2) the concealment prevented plaintiff's discovery
of the nature of the claim within the limitations period; and
(3) the plaintiff exercised due diligence in pursuing the

discovery of the claim during the period plaintiff seeks to have tolled." Koch, 699 F.3d at 157 (internal quotation marks and citation omitted). "Allegations of fraudulent concealment are subject to the particular pleading requirements set forth in Federal Rule of Civil Procedure 9(b)." In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig., No. 00-cv-7804, 2004 WL 487222, at *3 (S.D.N.Y. Mar. 12, 2004). In cases in which the plaintiffs allege fraudulent concealment, due diligence requires the plaintiffs, among other things, to review relevant patent applications when they are filed because they may contain alleged trade secrets. See Ferring B.V v. Allergan, Inc., 4 F. Supp. 3d 612, 632 (S.D.N.Y. 2014) ("Either Ferring never conducted the review [of patent applications] it claims it did, which is fatal to its equitable tolling theory, or it conducted a review but, through lack of reasonable diligence, failed to recognize that the patent application contained confidential Ferring information, which likewise is fatal.").

The plaintiffs have not alleged with particularity that the defendants fraudulently concealed their various misappropriation claims as required by Rule 9(b), and in particular that the defendants wrongfully concealed material facts related to the defendants' alleged wrongdoing. See Anwar v. Fairfield Greenwich Ltd., 286 F.R.D. 258, 260 (S.D.N.Y. 2012) ("Rule 9(b) also requires a plaintiff to plead with particularity facts giving

22

rise to a strong inference that each defendant acted with the requisite state of mind, or scienter."). For example, one of the plaintiffs' primary allegations in support of their argument for fraudulent concealment is that a lawyer, Robin Silva, orchestrated Illumina's patent filings over many years in such a way that the subject matter of their patents could not be traced back to the plaintiffs' trade secrets. However, the plaintiffs do not allege these acts of fraudulent concealment with particularity, but rather state in conclusory terms that the defendants' authorship of their patents was carried out in deliberately fraudulent ways. See Anwar, 286 F.R.D. at 260.[8]

Even more fatal to the plaintiffs' argument, however, is that for the same reasons that the plaintiffs had inquiry, actual, or constructive notice of alleged wrongdoing as early as 1994 and no later than 2010 for statute of limitations purposes, equitable tolling is also not appropriate in this case because the plaintiffs did not act, and could not have acted, with due diligence in this case given that they allegedly discovered the alleged impropriety in 2015. See 421-A Tenants Ass'n, 760 F. App'x at 50 ("The tenants' failure to prosecute their lawsuit once on inquiry notice forecloses their argument that they acted

---

[8] These pleading deficiencies could be cured, in theory, with an amended complaint. However, the fraudulent concealment allegations fail for other reasons that could not be cured by amendment and therefore dismissal with prejudice is appropriate.

with 'reasonable diligence,' a prerequisite for equitable
tolling."). Indeed, the Complaint along with documents
incorporated by reference directly undermine the plaintiffs'
argument that they acted with the "[r]easonable diligence [that]
is a prerequisite to the applicability of equitable tolling."
Koch, 699 F.3d at 157. This is so for several reasons.

First, Fodor's name appeared on at least one patent
application in connection with the '501 patent series no later
than 1995, which undermines the plaintiffs' allegations that
Fodor fraudulently omitted his name from patent applications in
order to cover his tracks. Second, the existence of the "clear
and unmistakable marker for the theft of Dr. Zirvi's trade
secret" that the Illumina defendants allegedly included in some
of their patent applications likewise imposed upon the
plaintiffs a duty of reasonable diligence, the failure of which
undermines their argument for equitable tolling. See Zhongwei
Zhou v. Wu, No. 14-cv-1775, 2017 WL 1233994, at *6 (S.D.N.Y.
Mar. 31, 2017) ("In short, Plaintiffs waited years before
bringing this case. The record reflects that they failed to
exercise reasonable diligence in pursuing the facts and
investigating their suspicions while their claims were still
timely[.]"). Finally, the matters in this case are substantially
similar to the ones that Barany and Cornell litigated before the
USPTO and in the District of Delaware, matters about which

24

plaintiffs were either actually aware because they were named in the litigation or constructively aware because the proceedings were public. Due diligence required the plaintiffs to investigate any alleged misappropriation when these events occurred. See Landow v. Wachovia Secs., 966 F. Supp. 2d 106, 129 (S.D.N.Y. 2013) ("One who suspects a defendant of widespread fraud may be under a duty to see if others have sued the defendant and whether such suits revealed evidence of the fraud of which the plaintiff complains.") (quoting Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 363 (2d Cir. 2013)).

Each one of these events demonstrates a lack of due diligence on the part of the plaintiffs and therefore each event, by itself, is fatal to the plaintiffs' argument that equitable tolling should apply in this case. Taken as a whole, the plaintiffs' allegations of fraudulent concealment fail because the plaintiffs have not alleged with particularity the fraudulent concealment that the defendants allegedly engineered and because the facts alleged show that the plaintiffs were on notice, which required them to pursue their claims with due diligence. The timeline of events undermines any argument that the plaintiffs acted with reasonable diligence in investigating the alleged wrongdoing, as a matter of law, and no amended complaint could cure such deficiencies.

Therefore, the plaintiffs are not entitled to equitable tolling of the statutes of limitations.

**B.**

The federal claims in this case should also be dismissed because the plaintiffs failed to allege actionable post-enactment conduct. The DTSA became effective on May 11, 2016, at which point it created, among other things, a private right of action to sue for misappropriation of trade secrets and it also amended RICO to include the misappropriation of trade secrets as an enumerated predicate act. See Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, May 11, 2016, 130 Stat. 376, 376-382. The DTSA does not apply retroactively, but applies only to misappropriation for which "any act occurs on or after the date of the enactment of this Act." Id. at 381-82; RCC Ventures, LLC v. Am. DG Energy, Inc., No. 17-cv-3007, 2018 WL 1415219, at *3 (S.D.N.Y. Mar. 19, 2018) ("Because the only allegations of misappropriation of a trade secret that are pled with particularly predate the enactment of the DTSA, RCC has not stated a claim upon which relief may be granted.").[9]

---

[9] Some courts have held that the DTSA applies to pre-enactment conduct if the misappropriation continues after the enactment date. See Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp., No. 16-2499, 2017 WL 1105648, at *4 (E.D. Pa. Mar. 24, 2017) (collecting cases); Veronica Foods Co. v. Ecklin, No. 16-cv-7223, 2017 WL 2806706, at *13 (N.D. Cal. June 29, 2017) ("Courts have generally held that the DTSA applies to misappropriations that began prior to the DTSA's enactment if the misappropriation continues to occur after the enactment date, so long as the defendant took some relevant act after that date.") (quotation marks and citation omitted). In this case, there are no plausible allegations that any relevant pre-enactment conduct

In this case, the alleged misappropriation occurred in 1994 when Fodor allegedly stole the contents of the Barany grant proposal and then in 1999 when the Illumina defendants allegedly misappropriated the 187 files. These events occurred well before May 11, 2016, and therefore the plaintiffs cannot sue for these alleged acts misappropriations under the DTSA.

For the same reason, the RICO claims should also be dismissed. RICO makes it unlawful for a person to receive income "from a pattern of racketeering activity." 18 U.S.C. § 1962. A "pattern of racketeering activity requires at least two acts of racketeering activity[.]" 18 U.S.C. § 1961(5). To the extent that the plaintiffs allege misappropriation of trade secrets in violation of federal law to be the RICO predicates, that claim fails because the plaintiffs have not alleged any violation of the DTSA that post-dated the statutory enactment. See Democratic Nat'l Comm. v. Russ. Fed'n, 392 F. Supp. 3d 410, 442 (S.D.N.Y. 2019) ("Therefore, alleged violations of sections 1832 and 1832 [for misappropriation of trade secrets] can serve as predicate acts only for offenses occurring after May 11, 2016.").[10]

---

continued after May 11, 2016. See Cave Consulting Grp., Inc. v. Truven Health Analytics, No. 15-cv-2177, 2017 WL 1436044, at *5 (N.D. Cal. Apr. 24, 2017) ("The Court finds that without facts about when post-enactment use occurred and whether the information disclosed was new or somehow different from the prior misappropriation, plaintiff has failed to state a claim under the DTSA.").

[10] To the extent that the plaintiffs allege that the predicate RICO acts were instances of mail or wire fraud under 18 U.S.C. §§ 1341, 1343, that claim fails because the allegations in the Complaint on that point consist solely

## C.

Further, most of the misappropriation claims, either under federal or New York state law, should be dismissed for failure to state a claim upon which relief can be granted.[11]

In order to state a claim for misappropriation of trade secrets, a plaintiff must allege the existence of a trade secret, which under New York law is "any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it." E.J. Brooks Co. v. Cambridge Sec. Seals, 105 N.E.3d 301, 310 (N.Y. 2018) (internal quotation marks, citation, and alterations omitted). Additionally, a plaintiff must allege that the defendant obtained the trade secret through improper means. See Free Country Ltd. v. Drennen, 235 F. Supp. 3d 559, 567 (S.D.N.Y. 2016) (using proprietary information "in breach of an agreement or confidential relationship" may constitute misappropriation); see also Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 476

---

of alleged fraudulent misstatements made before the USPTO, which cannot form the basis of mail or wire fraud. See Semiconductor Energy Lab. Co. v. Samsung Electronics Co., 204 F.3d 1368, 1380 (Fed. Cir. 2000) ("[I]nequitable conduct before the PTO cannot qualify as an act of mail fraud or wire fraud for purposes of the [RICO] predicate act requirement.").

[11] Courts in the Southern District of New York often use New York state law cases when discussing misappropriation claims under the DTSA because the Second Circuit Court of Appeals has not yet addressed the DTSA in a reported opinion and the requirements are similar under state and federal law. See Medidata Sols., Inc. v. Veeva Sys., Inc., No. 17-cv-589, 2018 WL 6173349, at *3 n.1 (S.D.N.Y. Nov. 26, 2018).

(1974) ("A trade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering[.]").

"Although the Second Circuit has not articulated a specificity requirement, district courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." ExpertConnect, L.L.C. v. Fowler, No 18-cv-4828, 2019 WL 3004161, at *4 (S.D.N.Y. July 10, 2019). The existence of a trade secret is generally a question of fact, but in some situations whether information is a trade secret may be evident from the pleadings alone. See Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co., 1 F. Supp. 3d 224, 267 (S.D.N.Y. 2014), aff'd, 610 F. App'x 69 (2d Cir. 2015). Courts dismiss trade secrets claims when the alleged trade secrets are not, in fact, secret, or when the plaintiffs have not alleged sufficiently how the secrets derive independent economic value from not being generally known. See Vendavo, Inc. v. Price f(x) AG, No. 17-cv-6930, 2018 WL 1456697, at *4 (N.D. Cal. Mar. 23, 2018) ("[P]laintiff must describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the

29

defendant to ascertain at least the boundaries within which the secret lies."); Democratic Nat'l Comm., 392 F. Supp. 3d at 448 ("The DNC has not identified anything about the process of developing donor lists or fundraising strategies or shown how their particular value derives from their secrecy.").

In this case, the plaintiffs' allegations concerning misappropriation of negative trade secrets fail for two reasons. First, these allegations "resemble . . . broad categories of information" and are "vague," which, by itself, constitutes a reason to dismiss the claims. See AlterG, Inc. v. Boost Treadmills LLC, 388 F. Supp. 3d 1133, 1145 (N.D. Cal. 2019). The plaintiffs have therefore failed to identify their alleged secrets with "sufficient particularity" in order to apprise the defendants and the Court what information contained in the alleged negative trade secrets is truly secret and what information is not. See Big Vision Private, 1 F. Supp. 3d at 266-67.

Second, the plaintiffs have failed to allege how these negative trade secrets derive independent economic value from not being generally known given the existence of volumes of information publicly available in the patent applications and patents described in the Complaint. See E.J. Brooks, 105 N.E.3d at 316 ("A trade secret, by definition, must have economic value and provide a competitive advantage due to the exclusive use of

30

a product or technique."). It is difficult to see how negative trade secrets consisting of unsuccessful efforts to develop trade secrets and experimental dead ends, see SAC ¶ 12 n.1, can have independent economic value when the end result of the process, the positive trade secrets, have in fact been uncovered.

The plaintiffs have also failed to allege that the 187 files containing the 465-zip code set are a trade secret. Although the plaintiffs described these alleged trade secrets with sufficient particularity, the plaintiffs have failed to allege how this zip code set derives independent economic value from not being publicly known given the quantity of similar zip code sets publicly available, particularly in the roughly contemporaneously published '965 patent series. See Sarkissian Mason, Inc. v. Enter. Holdings, Inc., 955 F. Supp. 2d 247, 257-58 (S.D.N.Y. 2013) ("The components of the system are widely known, and the concept as a whole is of limited value because it is readily ascertainable. Thus, AutoMatic Buying System as an unexecuted concept is not a trade secret as a matter of law."), aff'd, 572 F. App'x 19 (2d Cir. 2014)

Therefore, the plaintiffs have failed to state a claim for misappropriation with respect to the negative trade secrets and

the 465-zip code set contained in the 187 files.[12] Moreover, because these claims are barred by the statutes of limitations as explained above, repleading would be futile, and the claims are appropriately dismissed with prejudice. See Wallace v. NYC Dept. of Corr., 112 F. App'x 794, 795 (2d Cir. 2004) (amendment is futile where the statute of limitations has long since run); Ferring, 4 F. Supp. 3d at 618-19.

### D.

Finally, the plaintiffs have failed to state a claim for the non-misappropriation common law claims for fraud, breach of fiduciary duty, conversion, tortious interference with prospective economic advantage, inequitable conduct, civil conspiracy, and breach of confidence.

---

[12] The plaintiffs may have survived a motion to dismiss the allegations of Fodor's misappropriation of trade secrets based on the alleged theft of the contents in the Barany proposal had those claims been brought in a timely complaint. Unlike the 187 files allegedly misappropriated in 1999, which were then published in substance by the plaintiffs themselves in the '965 patent series, the information contained in the Barany proposal allegedly formed the basis for the Affymetrix defendants' patent applications beginning in 1994. Moreover, the plaintiffs alleged with particularity the contents of the Barany proposal and which aspects of the technologies described therein constituted the alleged trade secrets. These allegations, along with allegations concerning the time and resources spent by both the plaintiffs and the defendants engaged in this work would tend to demonstrate the independent economic value of the description of the technology in the Barany proposal. See ExpertConnect, 2019 WL 3004161 at *5 (collecting cases concerning independent economic value). Finally, the plaintiffs alleged that Fodor misappropriated any information contained in the Barany grant proposal because he used it in violation of his NIH confidentiality agreement. See Free Country Ltd., 235 F. Supp. 3d at 567. Nevertheless, as explained above, these claims from over twenty-five years ago are plainly barred by the statute of limitations.

The plaintiffs' allegations of fraud fail because the plaintiffs have not pleaded any false statements or omissions made by the defendants upon which the plaintiffs reasonably relied. See Wall v. CSX Transp., Inc., 471 F.3d 410, 415-16 (2d Cir. 2006) ("Proof of fraud under New York Law requires a showing that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance.") (quotation marks and citation omitted).

The plaintiffs' claim for conversion lacks merit because the conversion of intangible property is not actionable under New York State law. See Matzan v. Eastman Kodak Co., 521 N.Y.S.2d 917, 918 (App. Div. 1987) ("There is no protected interest in an idea, but only in the tangible expression or implementation of that idea. It thus cannot be the subject of conversion."). Moreover, the mere fact that the alleged act of conversion involved learning intangible ideas from tangible documents does not make the claim actionable. See Rao v. Verde, 635 N.Y.S.2d 660, 661 (App. Div. 1995) ("While the plaintiff claims that the conversion cause of action remains viable because the defendants continued to use information that they

learned from such documents, this amounts to a claim for conversion of intangible property[.]").

The plaintiffs' allegations that the defendants tortiously interfered with the plaintiffs' prospective economic advantage are deficient because the plaintiffs have not pleaded specific, non-generalized interference with particular and ongoing business relationships in order to plead this tort. See Camp Summit of Summitville, Inc. v. Visinski, No. 06-cv-4994, 2007 WL 1152894, at *14 (S.D.N.Y. Apr. 16, 2007) ("Generalized allegations of impairment to claimant's ability to attract new business will not suffice.") (internal quotation marks, citation, and alterations omitted); Bus. Networks of N.Y., Inc. v. Complete Network Sols. Inc., 696 N.Y.S.2d 433, 435 (App. Div. 1999) ("[T]he cause of action for tortious interference with prospective business relations should have been dismissed for failure to allege any specific prospective relationship with which defendants interfered[.]").

The plaintiffs cannot state a cause of action based on alleged inequitable conduct before the USPTO because inequitable conduct cannot comprise a civil claim for damages, but is instead an equitable defense in a patent infringement case. See Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1285 (Fed. Cir. 2011) ("Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a

34

patent."); Solomon v. Khoury, No. CV 16-10176, 2017 WL 598758, at *3 (D. Mass. Feb. 13, 2017) ("[I]nequitable conduct is not an affirmative allegation that can be brought forth in a complaint.").

The plaintiffs cannot state a claim based on civil conspiracy because there is no independent tort of civil conspiracy under New York law. See McCarthy v. Weaver, 472 N.Y.S.2d 64, 65 (App. Div. 1984) ("Similarly, the seventh cause of action, which purports to state a claim for civil conspiracy, should be dismissed because there is no substantive tort of civil conspiracy in New York."). Where, as in this case, the plaintiffs' substantive claims are dismissed, there is no basis for a claim of conspiracy. See Kirch v. Liberty Media Corp., 449 F.3d 388, 401 (2d Cir. 2006) (failure to state a cause of action for torts underlying the alleged conspiracy requires that the claim for civil conspiracy be dismissed).

The plaintiffs fail to plead breach of confidence claims related to the two acts of misappropriation, in 1994 and in 1999, because an express contract allegedly covered the relationships at issue, and therefore there is no basis for an independent tort claim. See G5 Techs., Inc. v. Int'l Bus. Machs. Corp., No. 04-cv-1201, 2005 WL 2271741, at *14 (S.D.N.Y. Sept. 19, 2005) (disclosure in alleged violation of an express confidentiality agreement precludes a claim based on breach of

an implied confidentiality agreement). In this case, the plaintiffs allege that Fodor breached the express terms of his confidentiality agreement with Barany and the NIH in 1994. The plaintiffs also allege the Efcavitch and Applied Biosystems breached the terms of the confidentiality agreement between Cornell and Applied Biosystems in 1999.

The plaintiffs' non-misappropriation state law claims should therefore be dismissed for the additional reason that the plaintiffs cannot allege facts giving rise to these claims.

**CONCLUSION**

Therefore, the plaintiffs' Complaint is **dismissed** in its entirety. Because the plaintiffs have amended the Complaint twice before, and because further amendments would be futile, the complaint is dismissed **with prejudice.** The Court has considered all of the arguments raised by the parties. To the extent not addressed specifically above, the arguments are either moot or without merit. The Clerk is directed to enter judgment dismissing this case with prejudice. The Clerk is also directed to close all pending motions, and to close this case.

**SO ORDERED.**
**Dated:    New York, New York**
                **January 14, 2020**          /s/ John G. Koeltl
                                              **John G. Koeltl**
                                              **United States District Judge**